# UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

HERBERT PULGAR and
JORGE CINTRON, aka "King Papo"

**UNDER SEAL**

**CRIMINAL COMPLAINT**

CASE NUMBER:

MAGISTRATE JUDGE KEYS

**08CR 225**

*FILED*
*JN*
*MAR 18 2008*
*March 18, 200 8*
*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about August 29, 2007, in Cook County, in the Northern District of Illinois, defendant(s)

did conspire with each other and others to knowingly and intentionally distribute and possess with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

in violation of Title 21 , United States Code, Section 846.

I further state that I am a Special Agent for the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof: __X__ Yes _____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 18, 2008 _____    at    Chicago, Illinois _____
**Date**                                              **City and State**

MAGISTRATE JUDGE ARLANDER KEYS _____
**Name & Title of Judicial Officer**

_Arlander Keys_
**Signature of Judicial Officer**

STATE OF ILLINOIS      )
                       ) SS
COUNTY OF COOK         )

## **AFFIDAVIT**

I, Jason C. Rahoy, being first duly sworn on oath, depose and state as follows:

## I.    PRELIMINARY MATTERS

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to investigate and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.     This Affidavit is made in support of a criminal complaint charging that: on or about August 29, 2007, JORGE CINTRON, also known as (aka) KING PAPO, and HERBERT PULGAR conspired with each other and others to distribute and possess with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

3.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2006, and am presently assigned to the FBI's Joint Task Force on Gangs, Chicago Field Division, assigned to identify, disrupt, and dismantle Hispanic gangs operating in the Chicago, Illinois, area.

4.     I am responsible for investigating crimes that involve, among other things, the

1

unlawful importation and exportation of illegal narcotics, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, as well as the related laundering of monetary instruments, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952(a), 960 and 963, and Title 18, United States Code, Sections 1956 and 1957. In conducting these investigations, I have used a variety of investigative techniques and resources in investigations which have included physical and electronic surveillance, monitoring court-authorized wiretaps, the use of Confidential Human Sources ("CHSs") and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience, and conversations with other Special Agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

5.     As a result of my participation in this investigation, my review of reports prepared by FBI and Task Force Officers of the Chicago offices, I am familiar with all aspects of this investigation as described in this Affidavit. The information contained in this Affidavit includes the result of consensually monitored telephone calls, controlled narcotics purchases utilizing a CHS, information provided by a CHS, surveillance conducted by FBI and/or agents and local police from Chicago, independent investigation by the FBI, and agents' review of recordings of consensual-recorded conversations. Since this affidavit is

being submitted for the limited purpose of establishing probable cause to arrest the individuals identified above, I have not included each and every fact known to me concerning this investigation.

6.    Based on the information contained in his Affidavit, I submit that there is probable cause to believe that on or about August 29, 2007, JORGE CINTRON, aka KING PAPO, and HERBERT PULGAR conspired with each other and others to distribute and possess with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

## II.    PROBABLE CAUSE

### A.    FBI Confidential Human Source ("CHS")

10.    CHS is an associate of members of the Clark and Winnemac section of the Almighty Latin Kings Nation ("ALKN") street gang. CHS is not a member of the ALKN street gang. CHS has been providing reliable, timely information to the FBI since approximately June 2005. During this time, FBI Agents have spoken to CHS in person, or telephonically, on numerous occasions. A substantial portion of the information provided by CHS has been corroborated by independent investigation that includes physical surveillance, interviews, telephone record analysis, and several consensually monitored

conversations.[1]

11.    On November 16, 2005, CHS identified JORGE CINTRON from a CPD booking photograph. According to CHS, based on CHS's past conversations and interactions with CINTRON, CINTRON is involved in the distribution of narcotics.

12.    On May 18, 2007, CHS positively identified HERBERT PULGAR from a CPD booking photograph. According to CHS, based on CHS's past conversations and interactions with PULGAR, PULGAR is involved in the distribution of narcotics.

## B.    INVESTIGATION RELATED TO AUGUST 24, 2007, TRANSACTION

### August 23, 2007, Telephone Calls

13.    On or about August 23, 2007, at approximately 7:01 p.m., at the direction of agents, CHS placed a consensually recorded telephone call to PULGAR at telephone number (773) 879-1151 (hereinafter "Pulgar Phone A"). This call was answered by voicemail, and CHS left a message for PULGAR to return CHS' telephone call. At approximately 7:30 p.m., CHS reported to agents that PULGAR had returned CHS' telephone call. This conversation was not made in the presence of agents and not recorded. According to CHS, CHS told PULGAR during this call that he/she wanted three ounces of crack cocaine, and

---

[1]CHS has at least eleven prior arrests in the Chicago area, including arrests for aggravated assault, domestic battery, and resisting a peace officer. CHS has prior convictions for violation of a protection order and telephone harassment. CHS is actively cooperating with law enforcement in hopes of receiving assistance in joining the United States Marine Corps. CHS has been advised that it is unlikely that the FBI will be able to provide this type of assistance. CHS is not being paid by the FBI for CHS' cooperation with this investigation. On one occasion, while assisting with an unrelated investigation, CHS denied his/her presence at the location and time of criminal activity despite evidence to the contrary. When questioned, CHS denied any intent to deceive agents regarding his/her presence.

then told PULGAR that he/she would call him right back.

14.     At approximately 7:39 p.m., at the direction of agent, CHS placed a consensually recorded telephone call to PULGAR at Pulgar Phone A.  During this call, PULGAR[2] asked if CHS wanted "three of them " (three ounces of crack cocaine),[3] and asked if CHS wanted them (three ounces of crack cocaine) that day.  CHS told PULGAR that he/she wanted "them" possibly the following day.

15.     At approximately 8:00 p.m., CHS placed a consensually recorded telephone call to PULGAR at Pulgar Phone A.  During this call, PULGAR told CHS that he had "two kinds" (of cocaine), the kind for $800 that is good for "cooking," and the "other" kind for $700.  PULGAR told CHS that he "usually charge[s] people like 850, even nine" but stated that he would give CHS "a break."  CHS asked PULGAR if he could meet the following day, and PULGAR told CHS that he could.  CHS told PULGAR he/she would call him in the morning and let him know what time.

16.     At approximately 8:03 p.m., CHS placed a consensually recorded telephone

---

[2] The identification of HERBERT PULGAR in this Affidavit is based upon the following: First, CHS identified PULGAR from a CPD booking photograph.  Second, CHS identified PULGAR by voice subsequent to the consensual recordings.  Third, during particular recorded calls, PULGAR arranged to personally meet with CHS and those meetings were surveilled by law enforcement.

[3] The recorded conversations throughout this Affidavit have been summarized, and parentheses have been placed around language that represent my or other agents' understanding of what is being said during the recordings, based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation.  In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations.  Quoted material is not intended to be a final transcription of the audio recordings from which the quotes are taken.

call to PULGAR at Pulgar Phone A.  During this call, CHS told PULGAR, "I need it cooked" (processed into crack cocaine).  PULGAR asked if CHS wanted it "cooked" and "done already," and CHS replied, "yeah, I want it already done . . . ."  PULGAR told CHS that he would charge CHS "25 dollars a little more to cook, cook each one of 'em."

### August 24, 2007, Telephone Calls

17.    On or about August 24, 2007, at approximately 11:12 a.m., CHS placed a consensually recorded telephone call to PULGAR at Pulgar Phone A.  During this call, PULGAR asked if CHS was ready.  CHS asked PULGAR for the "final price."  PULGAR asked CHS, "you want it like that, right" (cocaine processed into crack cocaine) and also asked if CHS wanted "three" (ounces).  CHS replied affirmatively.  PULGAR then told CHS, "I wanna do 850" ($850 per ounce), and told CHS they would meet in an apartment in the vicinity of Humboldt Park.

18.    At approximately 1:23 p.m., CHS placed a consensually recorded telephone call to PULGAR at Pulgar Phone A.  During this call, PULGAR told CHS to go to Fullerton and St. Louis, Chicago, Illinois.

### August 24, 2007, Narcotics Transaction

19.    On August 24, 2007, at approximately 1:25 p.m., agents provided CHS with $2,550 United States Currency ("USC") to purchase the narcotics. Agents searched CHS and CHS' vehicle with negative results.  Agents provided CHS with concealed audio and video recording devices.

6

20.    At approximately 1:45 p.m., CHS began driving to the vicinity of Fullerton and St. Louis, Chicago, Illinois. Surveillance agents ("surveillance") observed CHS continuously while en route to this location.

21.    At approximately 1:58 p.m., surveillance observed CHS enter the Barber Shack, 3521 West Fullerton Avenue, Chicago, Illinois, which according to CHS is a location where PULGAR often hangs out. According to CHS, he/she talked to PULGAR in the Barber Shack for approximately 30 minutes.

22.    At approximately 2:26 p.m., surveillance observed PULGAR exit the Barber Shack, and observed CHS and PULGAR walk east on Fullerton. PULGAR asked CHS for the money. CHS told PULGAR that he/she did not have all the money, but would go get the money and return in 15 minutes. CHS then departed and proceeded to a predetermined meeting location.

23.    At approximately 2:40 p.m., agents met CHS at the predetermined location.

24.    At approximately 2:46 p.m., CHS received a telephone call from PULGAR. This call was consensually recorded, however portions of PULGAR's side of the conversation are unclear. During this call, PULGAR told CHS that, "the guy" (his narcotics supplier) should arrive "here" (the Barber Shack) in approximately eight minutes.

25.    At approximately 2:56 p.m., CHS departed the predetermined meeting location and proceeded to the Barber Shack. Surveillance agents observed CHS continuously while en route to this location.

26.     At approximately 3:03 p.m., CHS arrived in the vicinity of the Barber Shack, at which time surveillance observed PULGAR enter CHS's vehicle. PULGAR was in CHS's car until approximately 3:36 p.m.. After entering CHS's car, PULGAR told CHS to drive around the block, and that, "my cousin's comin' right now." PULGAR asked CHS for the money, and CHS provided PULGAR with the $2,550. PULGAR told CHS, "its gonna be fire, cooked up already." PULGAR counted the money while they drove around the block.

27.     At approximately 3:04 p.m., while PULGAR was in the CHS's car, PULGAR received a telephone call. PULGAR's side of the ensuing telephone call was captured by the CHS's recording device. During this telephone call, PULGAR said, "stay over there. 'Cause I'm just going around the block. I'm gonna go back over there (to the area near the Barber Shack)." PULGAR continued to count the money, and told CHS that they needed to return to the Barber Shack because his cousin was going to meet them there with "it" (the crack cocaine).

28.     At approximately 3:08 p.m., surveillance observed CHS park on the north side of Fullerton Avenue, Chicago, Illinois. At approximately 3:09 p.m., PULGAR told CHS, "So, he (PULGAR's narcotics supplier) should be here any minute now . . . . He was already driving over here."

29.     At approximately 3:11 p.m., while in the CHS's car, PULGAR received another phone call. PULGAR's side of this call was recorded by the CHS's recording device. During this call, PULGAR stated, "I'm tellin' you, callin' you for you could park in

8

back of me. I'm parked in front of the pizza place, not in front of the barber shop (Barber Shack) . . . facing west . . . Okay? Alright."

31.    At approximately 3:35 p.m., PULGAR received a telephone call. PULGAR's side of this call was recorded by the CHS's recording device. During this call, PULGAR stated, "I'm gonna jump in with you. You just park right-oh, I'm here, man, waiting for you." Segments of the caller's portion of this conversation were not recorded. PULGAR continued, "Let me get, you know, get that (three ounces of crack cocaine) for you could get outta here. I'm ready. My brother got - needs to go. Alright, here waiting for you." PULGAR continued, "why don't you get parked behind me, no?" PULGAR then stated, "Yeah, right behind me, dog. Right across the street from the Carnita Sel Pisa. From the pizza place." PULGAR hung up the phone, and told CHS, "That's him right there, man."

32.    At approximately 3:35 p.m, surveillance agents observed a red Chevrolet Monte Carlo, Illinois license plate #X14-4288, park on the north side of Fullerton behind CHS's vehicle.

33.    At approximately 3:36 p.m., surveillance agents observed PULGAR exit CHS's vehicle and approach the passenger's side of the red Monte Carlo. Surveillance agents observed PULGAR lean into the front passenger side window of the red Monte Carlo and grab a plastic bag from the passenger seat area with his right hand. PULGAR put the plastic bag in his right side pants pocket, returned to CHS's vehicle, and leaned into the passenger side door of CHS's vehicle. According to CHS, PULGAR placed three plastic baggies

9

containing an off-white, rock-like substance on the passenger seat of CHS' vehicle. PULGAR pointed to one of the baggies and told CHS, "Air this one out. Air it out. Open it and let it air out, okay, 'cause it's still a little wet. These are good. So air this one out, okay?" Based on my experience as a law enforcement officer, the phrase "air it out" refers to the need to dry the cocaine after it has recently been processed into crack cocaine.

34.    After PULGAR delivered the suspect narcotics to the CHS, surveillance observed PULGAR walk to the Monte Carlo and enter the vehicle, which then drove west on Fullerton. Several minutes later, surveillance observed the Monte Carlo stop near the corner of Drake and Fullerton. PULGAR exited the vehicle and walked west on the south side of Fullerton.

35.    At approximately 3:37 p.m., surveillance observed CHS depart and drive west on Fullerton. Surveillance observed CHS continuously while en route to a pre-determined meeting location.

36.    At approximately 4:04 p.m., CHS met agents at the predetermined meeting location, and provided agents with three plastic baggies containing an off-white rocky substance, that CHS identified as the narcotics PULGAR provided CHS. Agents again searched CHS and CHS's vehicle with negative results.

37.    The drug evidence was transported to the Drug Enforcement Administration ("DEA") laboratory, where it tested positive for the presence of cocaine base, and was found to weigh 86.9 grams.

### C.    INVESTIGATION RELATED TO AUGUST 29, 2007, TRANSACTION

#### August 23 and 24, 2007, Telephone Calls

38.    On or about August 23, 2007, at approximately 6:55 p.m., CHS placed a consensually recorded telephone call to CINTRON[4] at telephone number (708) 662-0550. During this call, CHS asked CINTRON if CINTRON could get CHS "three O-Z's cooked," which meant, based on CHS's prior dealings with CINTRON and CHS's regular usage of such terms, three ounces of crack cocaine. CINTRON told CHS that he would call his "boy" (narcotics supplier), and would call CHS back.

39.    At approximately 8:07 p.m., CHS placed a consensually recorded telephone call to CINTRON at telephone number (708) 662-0550. During this call, CINTRON told CHS that "he" (CINTRON's narcotics supplier) did not call CINTRON back, and that when he calls CINTRON, CINTRON would call CHS. CINTRON confirmed that CHS wanted "three" (ounces of cocaine). CHS replied, "Yeah, but it needs to be cooked" (processed into crack cocaine). CINTRON replied, "Yeah, I know, three. Alright."

40.    On or about August 24, 2007, at approximately 1:31 p.m., CHS received a telephone call from CINTRON calling from telephone number (708) 268-9139. This call was consensually recorded. During this call, CHS asked CINTRON if he "figure[d] that out,

---

[4]The identification of JORGE CINTRON in this Affidavit is based upon the following: First, CHS identified a photograph of CINTRON. Second, CHS identified CINTRON by voice subsequent to the consensual recordings. Third, during particular recorded calls, CINTRON arranged to personally meet with CHS and that meeting was surveilled by agents. Fourth, agents reviewed the consensual recording, and identified CINTRON through a law enforcement booking photograph.

what I asked you for" (obtained three ounces of crack cocaine).  CINTRON replied that he

had not.

### August 28, 2007, Telephone Calls

41.     On August 28, 2007, at approximately 6:11 p.m., CHS placed a consensually

recorded telephone call to CINTRON at telephone number (708) 662-0550.[5] During this call,

CHS asked CINTRON, "you know what I'm looking for, right."  CINTRON replied, "the

three" (ounces of crack cocaine), and CHS replied, "yeah."  CINTRON told CHS that he

would place another call and call CHS back.

42.     At approximately 6:24 p.m., CHS placed a consensually recorded telephone

call to CINTRON at telephone number (708) 662-0550.  During this call, CINTRON told

CHS, "he (CINTRON's narcotics supplier) got some shit (crack cocaine), but he wants . . .

900 . . . a piece ($900 per ounce)."  CINTRON and CHS agreed to meet at CINTRON's

residence the following day at 1:30 p.m.  CINTRON told CHS, "it's going to be already

cooked."

### August 29, 2007, Telephone Call

43.     On or about August 29, 2007, at approximately 11:23 a.m., CHS placed a

consensually recorded telephone call to CINTRON at telephone number (708) 695-5129.

During this call, CHS asked CINTRON, "we cool?"  CINTRON replied, "yeah, we cool so

far . . . .  He (CINTRON's narcotics supplier) told me he was coming . . . ."  CHS told

---

[5]During this call, a call waiting tone sounds and the recording is terminated.  At
approximately 6:12 p.m., the recording of the telephone call resumes.

CINTRON, "I don't want to go no where else if I already got you lined up," to which CINTRON replied, "ok, cool, don't trip." CHS and CINTRON agreed to meet at 2:00 p.m. that day. CINTRON then told CHS, "I'm going to call him (CINTRON's narcotics supplier) though, right now." CINTRON agreed to contact CHS.

### August 29, 2007, Two Ounce Crack Cocaine Transaction

44.    At approximately 1:37 p.m., surveillance observed a silver Chevrolet Malibu, Illinois license plate # 632-0076 (hereafter the "silver Malibu"), pull into the driveway of the residence located at 2126 North 76th Avenue, Elmwood Park, Illinois.[6] Illinois license 632-0076 is registered to Enterprise Leasing Company of Chicago, 1050 North Lombard Road, Lombard, Illinois. The driver of the silver Malibu was identified by surveillance agents as PULGAR. PULGAR exited the silver Malibu and walked to the back of the residence.

45.    At approximately 1:50 p.m., agents searched CHS and CHS' vehicle for narcotics, weapons, and money. Agents retrieved $80 USC from CHS that agents took possession of until the conclusion of the transaction. Agents provided CHS with $2,700 to purchase the narcotics. Agents provided CHS with concealed audio and video recording devices.

46.    At approximately 1:57 p.m., surveillance observed CINTRON leaning into the driver's side door of the silver Malibu. PULGAR was observed seated in the driver's seat of the silver Malibu.

------

[6]CHS confirmed this was the then-current address for CINTRON based on his/her prior conversations with CINTRON.

47.    At approximately 2:07 p.m., CHS placed a consensually recorded telephone call to CINTRON. During this call, CHS told CINTRON that he/she was on the way to CINTRON's residence. CINTRON then handed the telephone to PULGAR. PULGAR asked CHS where he/she was, and told CHS to meet him at the place they previously met (the Barber Shack). CHS told PULGAR that CINTRON had "better stuff" (higher quality crack cocaine). PULGAR asked CHS, "you didn't like that stuff" (crack cocaine PULGAR provided CHS on August 24, 2007)? CHS replied, "it was alright . . . . [CINTRON] said he had . . . better quality." PULGAR told CHS, "this shit's fire bro . . . ." CHS repeated that he/she was going to CINTRON's residence, and PULGAR again told CHS to meet him where they met last time (the Barber Shack). CHS told PULGAR that he/she would call him right back.

48.    At approximately 2:14 p.m., CHS placed another consensually recorded telephone call to CINTRON. During this call, CHS told CINTRON that he/she wanted to deal with him (CINTRON), and that he/she was two minutes away from his residence. CHS told CINTRON he/she was coming to his house.

49.    At approximately 2:17 p.m., CHS departed from the predetermined meeting location and traveled in CHS' vehicle via city streets to CINTRON's residence, 2126 North 76th Avenue, Elmwood Park, Illinois. Surveillance observed CHS continuously while en route to this address.

50.    At approximately 2:21 p.m., surveillance observed CHS park in front of 2126

14

North 76th Avenue.

51.    After CHS arrived at the residence, CINTRON told CHS in person that CHS should go with PULGAR.  CINTRON told CHS, "it's different shit (crack cocaine) bro, it's not the same shit (crack cocaine)."  PULGAR asked CHS, "why, they didn't like that (crack cocaine) though?"  CINTRON then said, "my shit (crack cocaine) and his (PULGAR's) shit (crack cocaine) is different shit (crack cocaine) bro."  CHS asked CINTRON if it was alright for him/her to go with PULGAR.  CINTRON replied, "yeah . . . you're coming right back here anyways."  CHS then departed the residence with PULGAR in the silver Malibu.

52.    At approximately 2:24 p.m., surveillance observed CHS and PULGAR traveling via city streets in the silver Malibu east on Palmer Street.

53.    While traveling to the Barber Shack, PULGAR told CHS, "get the money ready" and also told CHS, "it's crack . . . it can't get any fucking better . . . crack is crack, yeah bro."  According to CHS, shortly before arriving at the Barber Shack, PULGAR took the $2,700 USC from CHS.

54.    At approximately 2:42 p.m., surveillance observed the silver Malibu park on Fullerton Avenue, in the vicinity of the Barber Shack.  PULGAR exited the silver Malibu and walked in the direction of the Barber Shack, 3521 West Fullerton Avenue, Chicago, Illinois.  CHS remained in the silver Malibu.

55.    At approximately 2:45 p.m., surveillance observed the red Chevrolet Monte Carlo parked in front of the Barber Shack. Surveillance observed Individual A seated in the

15

Monte Carlo.

56.     At approximately 2:48 p.m., surveillance observed PULGAR and Individual

A exit the red Monte Carlo and enter a burgundy Oldsmobile, Illinois license plate #X14-

5814.  Surveillance observed PULGAR sitting in the diver's seat of the Oldsmobile, and

Individual A in the passenger seat.   Surveillance then observed PULGAR exiting the

Oldsmobile and walking towards the silver Malibu.

57.     At approximately 2:49 p.m., surveillance observed PULGAR sitting in the

driver's side of the silver Malibu.  Surveillance also observed CHS in the silver Malibu at

this time.  According to CHS, PULGAR returned to the Malibu with a quantity of suspect

crack cocaine contained in a plastic baggie that he provided to CHS.   PULGAR told CHS,

"I told you it's (crack cocaine) different . . . ."  PULGAR told CHS, "you gotta air it (crack

cocaine) out a little bit, we're going to do that now . . . ."   CHS asked PULGAR if the

quantity was "three ounces," and PULGAR replied, "yeah, you got three ounces in there. Air

it out, okay."  Surveillance agents observed PULGAR exit the vehicle.

58.     According to CHS, after PULGAR exited the vehicle CHS placed a telephone

call to CINTRON.  CHS' portion of this call was recorded.  During this call, CHS told

CINTRON that the quantity of crack cocaine that PULGAR provided to the CHS was not

three ounces.

59.     At approximately 2:54 p.m., surveillance observed PULGAR outside the

Barber Shack, and after a few minutes, return to the Malibu. The Malibu, with PULGAR and

CHS inside, then departed and traveled to CINTRON's residence, 2126 North 76th Avenue.

60.    When they arrived, CHS entered CINTRON's residence and according to CHS, PULGAR remained outside.  Once inside, Individual B and CHS weighed the quantity of narcotics PULGAR provided to CHS.  Individual B told CHS and CINTRON that the substance being weighed is, "56 (grams), this is short."

61.    According to CHS, CINTRON then placed a telephone call to PULGAR. During this call, CINTRON stated, "that shit's (cocaine) short like hell..."  CINTRON explained, "it's got 56 grams, suppose to be 84 (grams) bro."  CHS asked CINTRON, "this (the narcotics) came from you right," and CINTRON replied, "yeah, from my guy."

62.    After the call was completed, PULGAR entered CINTRON's residence. CINTRON weighed the quantity of crack cocaine on a scale, which indicated the narcotics provided to CHS by PULGAR weighed less than three ounces.  PULGAR told CINTRON and Individual B that their scale was broken.

63.    At approximately 3:24 p.m., surveillance observed PULGAR exit the residence, enter the silver Malibu, and depart.  CHS then departed CINTRON's residence, got into his/her vehicle, and drove to the predetermined meeting location.

64.    At approximately 3:40 p.m., agents met CHS at the predetermined meeting location.  Agents retrieved from CHS a clear, plastic baggie containing an off-white, rock-like substance.  Agents again searched CHS and CHS' vehicle for weapons and additional narcotics.  A small pocket knife was located in CHS' vehicle; otherwise the results of the

17

search were negative.

### August 29, 2007, Telephone Calls

65.    At approximately 4:04 p.m., at the direction of agents, CHS placed a consensually recorded telephone call to CINTRON at telephone number (708) 662-0550. During this call, CHS told CINTRON, "this shit (crack cocaine) is under two ounces . . . I got ripped off bro." CINTRON replied, "what do you mean under two . . . it can't be under two ounces." CINTRON asked CHS, "how much is in the bag?" CHS replied, "50.8 (grams) right now." CINTRON repeated "50.8," and told CHS that he would call CHS right back.

66.    At approximately 4:07 p.m., CHS received a telephone call from CINTRON. This call was consensually recorded.   During this call, CINTRON told CHS, "he (CINTRON's narcotics supplier) told me give him an hour and a half and [he'll] call me right back, and he will probably bring it (one ounce of crack cocaine) over here . . . .  I just told him just drop it off at my house . . . he's an ounce short bro." CINTRON then told CHS, "as soon as he gets here with the shit (one ounce of crack cocaine), then I'm going to call you so you can pick it up." CHS agreed to go to CINTRON's residence in approximately an hour and a half.

67.    At approximately 5:27 p.m., CHS received a telephone call from PULGAR. This call was not received in the presence of agents and not recorded.  According to CHS, during this call PULGAR told CHS that he (PULGAR) was delivering an ounce of crack cocaine to CINTRON's residence.

**August 29, 2007, Delivery of One Ounce of Crack Cocaine**

68.    At approximately 5:55 p.m., agents searched CHS and CHS' vehicle. Agents retrieved $145 USC and a pocket knife from CHS that agents held for the duration of the transaction. Agents provided CHS with concealed audio and video recording devices.

69.    At approximately 5:59 p.m., at the direction of agents, CHS placed a consensually recorded telephone call to CINTRON at telephone number (708) 662-0550. During this call, CINTRON told CHS, "he's (PULGAR) bringing it (one ounce of crack cocaine) right now." CINTRON told CHS to arrive at his residence in half an hour. CHS agreed.

70.    At approximately 6:17 p.m., CHS departed in his/her vehicle and traveled to CINTRON's residence. Surveillance observed CHS continuously while en route to this location, and while returning to meet agents at a predetermined location.

71.    At approximately 6:22 p.m., surveillance observed CHS park in front of CINTRON's residence, 2126 North 76th Avenue, Elmwood Park, Illinois. CHS entered the residence.

72.    At approximately 6:45 p.m., surveillance observed the silver Malibu pull into the driveway of 2126 North 76th Avenue. Surveillance observed PULGAR driving the silver Malibu. Surveillance observed PULGAR exit the silver Malibu carrying an unidentified object under his arm.

73.    At approximately 6:47 p.m., PULGAR entered the residence. PULGAR had

with him a two ounce quantity of crack cocaine, an eighth ounce quantity of powder cocaine, and a one ounce quantity of crack cocaine. While inside the residence, PULGAR told CHS that he "picked up another one (ounce of crack cocaine)." CINTRON asked PULGAR whether he had "powder" (cocaine). PULGAR replied that he "got both (powder cocaine and crack cocaine)" and that, "this shit (cocaine) comes back good . . . . I just cooked it up right now." PULGAR provided CHS a clear, plastic baggie containing a substance, suspected crack cocaine. CHS then departed the residence.

74.　At approximately 7:07 p.m., surveillance observed CHS exit CINTRON's residence, enter his/her vehicle, and then depart.

75.　At approximately 7:15 p.m., agents met CHS at a predetermined location. Agents retrieved from CHS a clear plastic baggie containing an off-white, rock-like substance. Agents searched CHS and CHS' vehicle for weapons and additional narcotics with negative results.

76.　The two baggies containing suspect narcotics provided to agents by CHS that day were subsequently transported to the Drug Enforcement Administration laboratory where they tested positive for cocaine base, and were found to weigh 80.8 grams.

77.　According to CHS, CINTRON now resides at 3311 West Evergreen Avenue, Chicago, Illinois. According to CHS, CINTRON leaves for work each morning at 5:30 a.m.. On March 16, 2008, agents observed CINTRON depart from his residence at approximately 6:00 a.m.. Based on my training and experience, and based on the information above, I

believe that waiting until 6:00 a.m. to execute an arrest warrant for CINTRON may result in the destruction of evidence and may endanger law enforcement officers executing the warrant.

Based on the foregoing, I believe there is probable cause to support the requested criminal complaint.

FURTHER AFFIANT SAYETH NOT.

Jason C. Rahoy
Special Agent, FBI

Subscribed and sworn to before me
this 18th day of March, 2008.

ARLANDER KEYS
MAGISTRATE JUDGE

21